Filed 4/28/23  P. v. Mercado CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>REYNA MERCADO, et al.,<br><br>Defendants and Appellants. | B322524<br><br>(San Bernardino County Superior Ct. Nos. FVI17002214, FVI17002215) |

APPEALS from a judgment of the Superior Court of San Bernardino County, Tony Raphael, Judge.  Remanded for resentencing.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant Reyna Mercado.

Christopher Nalls and Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant Danielle Cummings.

Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Charles Ragland, Senior Assistant Attorney

General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Reyna Mercado (Mercado) and Danielle Cummings (Cummings) (collectively defendants) were jointly tried for the killing of 12-year-old Makiya W. The trial took place in front of two juries. At the conclusion of trial, one jury found Mercado guilty of murder in the first degree (Pen. Code, § 187, subd. (a); count 1)[1] and shooting at an inhabited dwelling (§ 246; count 2). The other jury found Cummings guilty of the same counts.

On appeal, defendants contend: (1) substantial evidence does not support the juries' verdicts as to the first degree murder counts; and (2) remand for resentencing on count 2 is necessary because of the trial court's erroneous application of the merger doctrine, and for the trial court to consider recently enacted Senate Bill No. 567 (2020–2021 Reg. Sess.) and Assembly Bill No. 124 (2020–2021 Reg. Sess.).

We affirm the verdicts and remand the matter for resentencing as to count 2 only.

———————————

[1] All subsequent statutory references are to Penal Code unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

I. **People's case**

### A. Events leading up to encounter at DD's Discounts

In April 2017[2], Christopher Hicks (Hicks) and Cummings became acquainted while working at the same retail department store. At the time, Hicks was in a relationship with Maesha McCullers (McCullers), and they resided together in a house on Monaco Drive (the Monaco house) in Victorville. There were three additional adults and six minors (including Makiya) residing in the Monaco house.[3]

Sometime in May, McCullers began to suspect Hicks of infidelity. By going through Hicks's cellphone records and Facebook account, McCullers learned of Cummings's existence and initiated contact with her through Facebook. Using Facebook, McCullers also began communicating with Anthony Pitts (Pitts), the person Cummings identified as her "significant other" on Facebook. McCullers also contacted Pitts's mother on Facebook.

McCullers and Cummings eventually spoke over the telephone wherein Cummings maintained that her relationship with Hicks was strictly platonic. Shortly after this conversation, McCullers discovered a cellphone hidden in Hicks's backpack. Hicks reported that Cummings had given him the cellphone so

---

[2] Because the underlying events took place in 2017, all subsequent date references are to that year unless otherwise specified.

[3] McCullers was Makiya's mother. At the time of Makiya's death, both individuals were approximately the same height and had the same hair style.

3

that they could communicate surreptitiously. This information angered McCullers and led to an exchange of text messages between McCullers and Cummings. In this exchange, McCullers told Cummings that she would fight Cummings and "beat her ass." Cummings continued to deny a sexual relationship with Hicks, and expressed anger at McCullers's accusations with messages like: "Girl, he's lying. IDGAF. Now I'm tired of yo ass harassing me. Shit, I didn't put that shit in there. Tell that muthafucka stop lying." Over text message, McCullers reiterated her desire to fight Cummings and provided Cummings with the address to the Monaco house as an invitation to fight.

In late May, McCullers requested that Hicks move out given his infidelity. Cummings came to the Monaco house to pick up Hicks and his belongings, and together they drove to a motel. Cummings and Hicks began to reside together at the motel. Around this time, Hicks became acquainted with Mercado, who Cummings identified as her "sister" and best friend. Hicks and Mercado became Facebook friends, and on several occasions, Mercado drove Hicks to the AM/PM convenience store located next to the Monaco house.

On the night of May 31, McCullers met Pitts at an apartment in Adelanto. They smoked marijuana. Pitts then showed off two firearms in his possession, namely a handgun and a sawed-off shotgun.[4] McCullers took a number of photographs of

---

[4] In court, McCullers identified the murder weapon as the same shotgun Pitts displayed to her that night. Hicks testified that Cummings told him that she had purchased a sawed-off shotgun for Pitts with money she had received from a tax return. Cummings denied purchasing the shotgun for Pitts.

the interior of the Adelanto apartment, believing that it was where Cummings resided. McCullers described the interior as "pretty nasty."

Meanwhile, the dispute between McCullers and Cummings continued to escalate over text message. On June 1, McCullers sent a message indicating that she was at Cummings's workplace and was ready to fight.[5] Cummings later responded: "Let's go there then. I know exactly where you stay, boo. You must not know who tfk . . . y'all fucking with." McCullers threatened to report Cummings to child protective services and the county's housing authority based on the "nasty pictures" that she took of the Adelanto apartment. Cummings demanded that McCullers stop harassing her and contacting Pitts's mother.

On or about July 3, Hicks and Cummings ended their intimate relationship, and Hicks moved back to the Monaco house. In late July, McCullers posted on Facebook photographs of the Adelanto apartment in order to embarrass Cummings. This infuriated Cummings and she confronted Hicks about the photographs at work. Cummings warned Hicks that unless McCullers took down the unflattering photos, Cummings "was going to have her baby daddy come shoot up [the Monaco] house." Hicks testified that Cummings often threatened to have Pitts come and shoot up the Monaco house whenever the ongoing dispute between Cummings and McCullers flared.

At the end of July, McCullers posted on Facebook some photographs of her enjoying an outing at a waterpark with Hicks.

---

[5] McCullers testified that she was not in fact at Cummings's workplace on that date and that the message was a bluff.

5

In response, McCullers received "like a thousand" messages from Mercado through Facebook messenger.[6] Hicks, who viewed these messages, described their content as: "Our kids are going to get up in the morning, they getting up for school. They are going to wake up to Jesus. I'm going to cocktail your house. Kiss your kids goodbye every time you leave to go to AM/PM because there might be a chance you might not make it back." Hicks confronted Mercado about these messages and asked her why she was getting involved. Mercado indicated that she was fed up with Hicks and McCullers "double teaming" Cummings and that she would no longer tolerate their poor treatment of Cummings.

Around this time period, the dispute between McCullers and Cummings continued to escalate. McCullers boasted about having sex with Hicks during the period when he was residing with Cummings at the motel. Cummings in turn revealed that she was having sex with Hicks during the period in May when she claimed that they were in a strictly platonic relationship. In another message, Cummings indicated that Hicks would eventually return to her and that she "will always win" by "playing dumb."

At one point during their ongoing text message exchange, Cummings indicated her knowledge that McCullers had purchased a gun. Cummings wrote: "You purchased a gun because you feel I harass you, which I don't. Your husband baby daddy, baby mama, whatever he is to you, told me it was for me. [¶] Don't you think you've done enough? Chris is back at home

---

[6] For purposes of this appeal, it is undisputed that Mercado used the name of "Nechi Walker" for her Facebook profile.

with you.  Why am I still being harassed?  Why is my life so important?  You're doing better then?"

On August 2, Cummings sent McCullers the following text message: "All y'all can consider yo self dead . . . . Fuck y'all.  I don't need to get my nd.  I'll call my daddy, in you not the only one with a gun.  I will shoot your fat ass.  Fuck y'all.  Get whoever.  It's on now." [7]

As the dispute between Cummings and McCullers escalated over text message during the time period of late July to early August, Mercado continued sending more messages to McCullers over Facebook.  One message stated: "Bitch, I'll have your own bd set you up.  I'm with that killing shit bitch.  Fuck a fight."  Another message: "How would you feel to get that call knowing you no longer have a baby daddy.  He was found dead at AM/PM.  Too bad for your raggedy ass kids fat bitch."  Mercado also wrote:

> "San Bernardino is what I am.  I can show it to you too.
> That's why when I come, it's not going to be pretty.  I'm
> going to come with the whole San Bernardino . . . .  [¶]  And
> like I said, you f* with my sister, you're f* with me.  So it
> didn't matter if I said something or pulled up with her
> when I come.  I'm coming b*.  [¶]  I'll f*around and throw a

---

[7] McCullers testified that she was not familiar with the term "nd" and did not know what the term was referencing.  She later testified that she understood the term "bd" to stand for "baby daddy."

whole fire.  What do you call those things?  Cork screws.  Yep, one of those do your f." [8]

Additionally, Mercado wrote: "And I pretty sure y'all got kids and dogs.  So let's not have to go there.  Don't reply talk'n shit either.  We finna fade all day or don't say shit back.  Leave my sis alone before you wind up missing bitch.  On my life you better not take me there.  You don't know me at all first." [9]

McCullers testified that she understood the term "pull up" as used in the context of Mercado's message to mean that Mercado was "going to pull up to my home and kill me."  McCullers admitted that the term "pull up" could also mean "come to" or "come over."

### B. Encounter at DD's Discounts

On August 9, McCullers and Makiya went to DD's Discounts retail store to buy Makiya a backpack.  McCullers saw Cummings and Mercado, along with their respective children, doing their own shopping.  McCullers pointed them out to the store manager, with whom McCullers had a friendly relationship.  Sensing a possible altercation, the store manager persuaded McCullers not to start anything because Makiya was present.  McCullers left the store and drove to the Monaco house, which

---

[8] McCullers testified that Facebook messenger will sometimes replace profane words with the first letter of the word and an asterisk.

[9] McCullers testified that she understood the term "finna" to mean "about to," and the term "fade" to mean something akin to causing bodily harm, shooting, and killing.  McCullers further testified that she understood the term "missing" to mean "to become dead."

was located less than a mile away. Once home, she dropped off Makiya and enlisted the assistance of two women who were there at the time. The group drove back to DD's Discounts to confront Cummings and Mercado.

Upon entering the store, McCullers located Cummings and Mercado at the register and asked, "Do we still have an issue?" Mercado indicated that she wanted to secure the children in her car before anything took place. McCullers assented to this request and went back outside with her two companions, while Cummings and Mercado remained in the store. The store manager observed that while inside the store, Mercado was yelling and throwing her hands about, and appeared angry over the situation. At one point, the store manager heard Mercado state that if McCullers intended to do " 'some bitch shit,' " then "they were going to pull up on her." Another employee of DD's Discount testified that she heard Mercado state: " 'I'm not going to go out there because I have my kids. I'll just get her later.' "

Cummings then made a telephone call, which the store manager suspected was to law enforcement based on snippets that she overheard. The store manager sent McCullers a text message warning her that law enforcement was on its way. McCullers and her friends left DD's Discounts at approximately 5:15 p.m. [10]

---

[10] When McCullers was called as a witness by Cummings in the defense's affirmative case, she testified that at 5:17 p.m., after she left DD's Discounts, she received a text message from the store manager warning her that defendants were "coming to y'all when they drop the kids off." McCullers testified that she did not take the warning seriously because defendants had

After McCullers and her friends left DD's Discounts, she received a voicemail from a person who sounded like Mercado. The voicemail stated: " 'No one's gonna fight in a store where there's a bunch of cameras. I don't get down that way. I told you that I'm gonna catch you unexpectedly.' " A text message from the same telephone number followed the voicemail, stating: " 'You did that. My turn.' "

Around 6:00 p.m., Jeanette Hodges (the girlfriend of Mercado's brother) received a telephone call from Mercado. During this conversation, Mercado told Hodges about the encounter at DD's Discounts, and stated that Mercado and Pitts "were going to go shoot up that house."[11]

### C. The purchase of ammunition at Turner's Outdoorsman

At approximately 7:55 p.m., Cummings, Mercado, and Pitts entered the Turner's Outdoorsman (Turner's) sporting goods store in Victorville. A cashier who was working that evening observed that the three individuals were laughing and talking to

---

threatened to "pull up" on two or three occasions previously, and nothing happened. Furthermore, it seemed to McCullers that Cummings appeared "a little spooked" when approached at DD's Discounts, and McCullers concluded at the time that Cummings "had a lot of mouth through the text messages and Facebook stuff, but in person she looked spooked."

[11] This evidence came out at trial through an audio recording of an interview that Hodges had with the San Bernardino Sheriff's Department shortly after the shooting. At trial, Hodges testified that she did not remember making this statement during the recorded interview.

each other upon entering the store. As they entered, Pitts approached the gun counter while Cummings and Mercado went to the aisle that held mace and pepper spray. Pitts retrieved two boxes of shotgun shells from the gun counter and approached Cummings and Mercado, who were "laughing and talking about something amongst each other." Pitts handed the two boxes of ammunition to Cummings, who in turned placed the ammunition in front of the cashier along with some pepper spray. As the cashier was ringing up the items, the cashier heard Mercado say aloud that she would rather "pop a cap" in someone instead of using a taser. Both Cummings and Mercado laughed at this comment. Once the cashier rang up the items, Cummings realized that she did not have enough money to purchase the two boxes of shotgun shells and the pepper spray that she had selected, so she opted for a different pepper spray that was less expensive. Cummings paid for the items with cash. The group left the store at 8:07 p.m.

### D. Shooting of Monaco home and aftermath

That night, at approximately 8:22 p.m., Patrisha Davis (McCullers's mother) was in the kitchen of the Monaco home. She heard a "loud blast" and saw a nearby sliding door shatter. She heard several "booms" after that initial blast and upon entering the living room, she observed shattered walls and items, and large holes through the front picture window that faced the street. She saw Makiya lying on the ground moaning, and could see blood seeping through Makiya's shirt.[12] According to Davis,

---

[12] A coroner for the county of San Bernardino testified that Makiya's cause of death was a shotgun wound to her chest and

11

at the time of the shooting, the curtains were drawn in front of the picture window. However, because the curtains were sheer and a lamp was illuminated inside, it was possible to see people standing or walking by the window from the outside.

Danielle Council (another adult residing in the Monaco home) testified that at approximately 8:20 or 8:22 p.m., she was sitting on a couch in the living room with her infant next to her in a stroller. Makiya was seated nearby on another couch. Council heard a "bang" that she initially believed was a firework. Makiya stood up just as a second shot was fired through the picture window in the living room. Council heard bullets whizzing through the room and glass shattering. Council recalled hearing a total of four shots. Council glanced outside, saw a white car parked across the street, and a silhouette of a person moving away from the house.

Ca. H., (12-years-old at the time of trial) testified that she was in the Monaco home at the time of the shooting. After the gunshots stopped, she ran upstairs, looked through a window, and saw a man who was wearing a dark mask running toward a white car. Once the man was inside the car, it sped off. Ca.'s testimony at trial differed from her interview with law enforcement, which took place shortly after the shooting. During that interview, Ca. stated that after the shooting, she ran outside and saw a man and a white car. Ca. did not mention during the interview that she ran upstairs or saw the man in question wearing a mask.

---

abdomen, and that she died minutes after she was shot. Shotgun pellets were found in her liver, lungs, and spleen.

Ch. H., who was 11-years-old at the time of trial, testified that on the evening of the shooting, she was on the stairs of the Monaco home with her sister Ca. Ch. recalled hearing four shots and seeing Makiya on the ground twitching. After the shooting ended, Ch. testified that she went upstairs and saw a white car leave and "smoke." On redirect, Ch. testified that she saw the white car from downstairs (not upstairs) and that the smoke was coming from the car after it left. Ch.'s testimony at trial differed from her statement given to law enforcement shortly after the shooting. In her statement, Ch. indicated she was upstairs when she first heard the gunshots and ran to her mother's room because she thought the sounds were of fireworks.

Hicks and McCullers were at their sons' football practice when they learned of the shooting. Hicks called Cummings and accused her of bringing Pitts over to shoot at the Monaco home. Cummings denied any knowledge of a shooting and indicated to Hicks that she was at home asleep. Hicks did not believe her, in part, because the background noise of their telephone call sounded like she was in a moving vehicle. Over the course of several more phone calls to Cummings, he heard the voices of Pitts and Mercado in the background.

Alexandria Whitaker, who lived at the same apartment complex as Mercado and considered herself Mercado's best friend, testified that on the evening of August 9, Mercado asked her to babysit Mercado's children. Sometime after 8:00 p.m., she observed Mercado returning to the apartment building in her car with Cummings and Pitts. Mercado appeared unusually subdued and quiet, and Cummings appeared upset and afraid. About an hour later, Pitts went to Whitaker's apartment and requested to use her car. She agreed and Pitts returned approximately 15

minutes later to return Whitaker's keys. Whitaker described Pitts' demeanor as "weird and panicky" during this interaction.[13]

Around midnight, Mercado and Cummings drove to Hodges's home to pick Hodges up for a trip to Las Vegas. The purpose of the trip was to pick up Mercado's niece who was staying in Las Vegas. According to Hodges, the group drove to an apartment complex and waited three hours in the parking lot. After waiting three hours, the group decided to leave and return home. Once they crossed the state line back into California, they were picked up by the San Bernardino County Sheriff's Department.

On August 10, the day after the shooting, officers searched Whitaker's car. Inside the trunk, they found a shotgun resting on top of a bag containing ammunition. A criminalist for the Sheriff's Department tested the shotgun found in Whitaker's trunk and confirmed through ballistics analysis that it was the weapon used to fire the shotgun shells recovered from the scene of the shooting. Further analysis confirmed that the recovered

---

[13] In the presence of the Mercado jury only, Whitaker testified that between the hours of midnight and 2:00 a.m. on August 10, Mercado informed her that a shotgun was in her car. When asked more questions about Mercado's statement, Whitaker testified that she was confused and that someone else (not Mercado) told her a gun was in her car. When asked who told her about the gun, Whitaker refused to answer the question indicating "it's irrelevant to the situation." Whitaker testified that she did not bother to call the police upon learning that a gun was in her car because she knew that officers would be on their way to search her car.

shells matched the brand and gauge of ammunition purchased by Cummings at Turner's on the night of the shooting.

## II. Cummings's testimony

Cummings testified that her friendship with Mercado dated back to when she was 11 years old. Although Mercado was not related to her biologically, she referred to Mercado as her "sister."

As to Pitts, Cummings first met him in 2015 and had a child with him in 2016. Their relationship was "off and on" through 2017. Throughout their relationship, Pitts was physically abusive toward Cummings. The physical abuse consisted of punching, choking, hitting her with a firearm, and threatening her life. According to Cummings, Pitts would become abusive "when things didn't go his way or he didn't get what he wanted." Pitts constantly remarked: "I'm 5 Crip" when he threatened Cummings with physical harm.

Initially, Pitts physically abused or threatened Cummings in private. However, toward the end of 2016, Pitts began to engage in abusive behavior on a daily basis and frequently in front of others. Cummings testified that Pitts physically threatened her family, including cousins who attempted to intervene on her behalf. Cummings resided with Pitts until May 2017, when Cummings moved out and began living with her mother.

In early June, Cummings and Hicks began residing together at a motel. Cummings testified in late June, she ran into Pitts in the parking lot of a county agency. Pitts forced her (and their child, who was with Cummings at the time) into his car. Pitts interrogated her at gunpoint about her relationship with Hicks. She lied to Pitts and convinced him that her relationship with Hicks was strictly platonic.

15

As to her dispute with McCullers, Cummings testified that even though McCullers constantly harassed and baited her over social media, she was frightened of McCullers and had no desire to engage in any type of physical altercation with McCullers. Cummings maintained that she was raised not to fight with people and in fact had tried on multiple occasions to deescalate the situation by refusing to fight. McCullers had threatened Cummings multiple times over text message, but deleted all of these messages before sharing screenshots with law enforcement.

When asked about the text message that she had sent on August 2 that contained the threat, "y'all can consider [yourself] dead," Cummings denied sending that particular text. Cummings testified that on that date, she received a text from an anonymous person threatening to "shoot up" Pitts's "hood." When Pitts saw this anonymous text, he suspected it came from McCullers and Hicks, and sent McCullers that threatening text message while pretending to be Cummings. Cummings acknowledged that she had written every other text message that McCullers had attributed to her as the sender.

When asked about whether she had made threats to Hicks about having her baby daddy shoot up his home, Cummings denied ever making such statements. Cummings testified that in the months leading up to the shooting, Pitts would become enraged every time he learned that McCullers contacted his mother and would take his anger out on Cummings through physical abuse.

Cummings testified that on August 9, after her initial encounter with McCullers at DD's Discounts, she called 911 while McCullers waited outside in the parking lot. A recording of the 911 call was played to both juries and during this recording, a

16

voice is heard stating: "No. I'm going to their house today. I'm not about to let this slide. No. No. No. I'm going there. No." Cummings testified that Mercado was the person who made that statement.

After the encounter at DD's Discounts, Cummings and Mercado returned to Mercado's apartment. Pitts was at the apartment babysitting. When Cummings recounted the events of the afternoon, Pitts became angry because he reasoned that there would be no reason for McCullers to challenge Cummings to a fight unless Cummings was still in an intimate relationship with Hicks. Pitts pulled out his shotgun, placed it at Cummings's head, and forced her to go fight McCullers. Cummings began to cry, went downstairs with Pitts and Mercado following her, and the three individuals immediately entered Mercado's car. Cummings denied seeing Pitts enter the car with the shotgun he had been holding to her head.

Pitts, Cummings, and Mercado left the apartment around 7:00 p.m. and drove to Turner's sporting goods store. Mercado drove while Cummings sat in the front passenger seat and Pitts sat in the back seat. Cummings testified that the purpose of going to Turner's was to buy pepper spray to assist her in fighting McCullers. While at Turner's, Pitts handed her two boxes of ammunition and directed her to buy them for him because they were on sale. Cummings did not object to purchasing the ammunition because she was afraid that Pitts would physically hurt her.

After the group left Turner's, they proceeded to the Monaco house. Upon arriving at the Monaco house, Cummings informed Pitts that no one was home. Pitts exited the car, and to Cummings's surprise, began shooting at the house. After the

17

shooting, they returned to Mercado's apartment. Pitts packed some clothes for himself and Cummings packed a bag for their child. Mercado drove Cummings, Pitts, and the child to the residence of Pitts's mother (in Redlands) and dropped off Pitts and the child.

From Redlands, Mercado and Cummings drove to Hodges's residence to pick her up for their planned trip to Las Vegas. After waiting several hours for Mercado's niece in Las Vegas, they drove home and were pulled over by law enforcement before reaching Victorville.

Cummings testified that when she first spoke to officers, she denied any knowledge about the shooting. In a subsequent interview, however, Cummings told officers that Pitts had forced her to go to the Monaco house to fight. Cummings explained that she initially lied because she was fearful that Pitts would kill her for cooperating.

Cummings testified at trial that she had no intention of killing anyone, never agreed to kill anyone, and never agreed to shoot at the Monaco house.

### III. Proceedings below

On September 11, 2017, the People charged Pitts, Cummings, and Mercado with the following: murder (§ 187, subd. (a); count 1); and shooting at an inhabited dwelling (§ 246; count 2). Pitts entered a plea and received an indeterminate sentence of 50 years to life, with a determinate term of six years stayed.

Over the course of several months in 2019, defendants were jointly tried before two separate juries. As to count 1, the trial court instructed the juries that with regards to first degree murder, the People were proceeding under two theories of liability: aiding and abetting first degree murder, and conspiracy

18

to commit first degree murder. To convict defendants of first degree murder under either theory of liability, the People were required to prove beyond a reasonable doubt that defendants harbored express malice and that they acted willfully, deliberately, and with premeditation. [14]

The Mercado jury found Mercado guilty of murder in the first degree and shooting at an inhabited dwelling, and the Cummings jury found Cummings guilty of the same counts.

At the March 2021 sentencing hearing, the trial court began with an indicated sentence for Cummings: 25 years to life imposed for count 1, and the upper term of seven years imposed and stayed for count 2. The trial court explained that it was imposing and staying sentence on count 2 pursuant to the "Merger Doctrine." It listed as aggravating factors the violence and great bodily harm, the high degree of cruelty, viciousness, callousness, the vulnerability of the victim, and the planning involved, including going to Turner's before the shooting. Counsel for Cummings objected on the grounds that under the merger doctrine, the trial court should impose no sentence at all on count 2 because the act of shooting into an inhabited dwelling merged into the act of murder. After taking a break to research the matter, and after further discussion with Cummings's counsel and the prosecution, the trial court concluded that the two acts had in fact "merged" and sentenced Cummings to: an indeterminate term of 25 years to life imposed on count 1, and a

---

[14] We omit any discussion of the trial court's instructions as to count 2 because those instructions are not relevant to the issues raised in the present appeal.

19

determinate, aggravated term of seven years imposed and stayed on count 2.

As to Mercado, the trial court pronounced the same sentence and listed largely the same factors in support of selecting the aggravated term on count 2.

Defendants filed timely notices of appeal from the final judgments.[15]

## DISCUSSION

### I.   Substantial evidence supports the first degree murder convictions as to both defendants

#### A. Standard of review

"In reviewing the sufficiency of the evidence to support a jury's verdict finding a defendant guilty of a criminal offense, we apply the substantial evidence standard of review." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57.) Under this standard of review, the appellate court must review the " 'whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260–261.) "Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Catlin* (2001) 26 Cal.4th

---

[15] In August 2022, by order of the Supreme Court, defendants' appeals were transferred from the Fourth District Court of Appeal, Division Two, to the Second District Court of Appeal.

81, 139.)  The substantial evidence standard applies whether direct or circumstantial evidence is involved.  (*Ibid*.)

"Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)  " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. " ' " (*Id*. at p. 1054.)  A reviewing court will not reweigh the evidence or reconsider witness credibility.  (*In re E.H.* (2003) 108 Cal.App.4th 659, 669.)

## B. The record contains substantial evidence of defendants' express malice

### 1. Applicable law

"A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice).  (§ 187.)" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder."  (*People v. Beltran* (2013) 56 Cal. 4th 935, 942.)

"Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).)  "Express malice is an intent to kill." (*People v. Gonzalez, supra,* 54 Cal.4th at p. 653; see also *People v. Polley* (1983) 147 Cal.App.3d 1088, 1092 ["[m]alice is express when there is manifested an intention unlawfully to kill a human being"].)

21

" 'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117.) Thus, "an aider and abettor's mental state must be at least that required of the direct perpetrator." (*Id*. at p. 1118.) To prove conspiracy to murder, the prosecution must prove that " '[e]*ach* of the persons specifically intended to enter into an agreement with one or more other persons for that purpose' and that '[e]*ach* of the persons to the agreement harbored express malice aforethought, namely a specific intent to kill unlawfully another human being.' " (*People v. Garton* (2018) 4 Cal.5th 485, 516.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26, the Supreme Court identified three categories of evidence courts have used to assess deliberation and premeditation: (1) planning activity, or facts about how and what the defendant did before the killing that show the defendant was engaged in activity directed toward, and intended to result in, the killing; (2) motive, or facts about the defendant's conduct from which the jury could reasonably infer a reason to kill; and (3) the manner of killing, or facts showing that the manner of killing was according to a plan or preconceived design. Notably, the *Anderson* factors are descriptive, not normative. (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) In other words, the "*Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations." (*Ibid*.)

22

### 2. Analysis as to Cummings

Cummings argues that substantial evidence does not support her conviction for first degree murder because there was insufficient evidence that: (1) she harbored an intent to kill; and (2) she knew of Pitts's intent to kill.

There was ample evidence adduced at trial to support the jury's findings as to both elements.

Cummings made several statements from which the jury could reasonably conclude that she harbored an intent to kill. After McCullers posted embarrassing photographs of the interior of Cummings's home, Cummings threatened Hicks that unless the photographs were taken down, Cummings would have Pitts shoot up the Monaco house. Hicks testified that Cummings made this threat on several occasions, usually whenever the dispute flared between Cummings and McCullers. Additionally, a week before the shooting, Cummings sent McCullers a text message explicitly warning McCullers that she should consider herself "dead" because Cummings intended to "shoot" her "ass."

Additionally, Cummings's conduct on the evening of the shooting demonstrated both an intent to kill and knowledge that Pitts intended to kill. After the encounter with McCullers, Cummings and Pitts (along with Mercado) went to Turner's and procured ammunition for a firearm that Cummings had purchased for Pitts earlier. While at Turner's, a witness saw Cummings talking with Pitts and laughing. After purchasing the ammunition, Cummings led Pitts directly to the Monaco house (with Mercado driving) and waited for Pitts until he was done shooting multiple rounds before helping him flee the scene. (See, e.g., *People v. Lee* (2011) 51 Cal.4th 620, 636 [bringing loaded gun to scene shows violence was considered].) At no point after the

23

shooting did Cummings attempt to render aid or contact law enforcement. Instead, once back at Mercado's apartment, Cummings packed a bag for the child that she shared with Pitts and assisted Pitts (and their child) in seeking refuge at Pitts's mother's home in another city.

On appeal, Cummings argues that her threatening messages to McCullers were simply part of a text message war that no one (including McCullers) believed would escalate to violence. Furthermore, argues Cummings, the fact that she purchased pepper spray shows that she intended to fight on the night of August 9 (and not kill). And, Cummings maintains, at most the evidence showed that she knew Pitts intended to shoot up the Monaco house, not that he intended to kill anyone. All of these arguments were made to the jury at trial, and the jury clearly rejected them. Cummings is asking this court to reweigh the evidence, draw different conclusions from the reasonable ones drawn by the jury, and reassess witness credibility. Given the standard of review, we decline to do so. (*In re E.H.*, *supra*, 108 Cal.App.4th at p. 669 [reviewing court will not reweigh the evidence or reconsider witness credibility].)

Finally, Cummings argues that she was acting under duress, which negates her intent to kill. Cummings points to her own testimony describing the abusive relationship with Pitts, her fear that Pitts would hurt her if she objected to the purchase of ammunition at Turner's, and her belief that unless she helped Pitts evade law enforcement, he would kill her and their child. But the jury was entitled to disbelieve Cummings's self-serving testimony and indeed, Cummings's credibility was very much at issue at trial. The prosecution presented evidence that Cummings had a practice of lying when it benefitted her. For

24

instance, she told McCullers she would eventually win back Hicks's affections by "playing dumb." After the shooting, when Hicks called Cummings to ask why she had brought Pitts over to shoot up the house, Cummings lied and said she was in bed. And, when Cummings was first questioned by law enforcement, she initially lied and denied any knowledge of a shooting.

### 3. Analysis as to Mercado

Mercado argues that substantial evidence does not support her conviction for first degree murder because there was insufficient evidence that: (1) she harbored an intent to kill; (2) she knew of Pitts's intent to kill; (3) she entered into an agreement with Cummings to kill; and (4) she acted with deliberation and premeditation.[16]

There was ample evidence adduced at trial to support the jury's findings as to all four elements.

First, Mercado made several statements from which the jury could reasonably conclude an intent to kill. After McCullers posted pictures of herself having fun at a waterpark with Hicks, Mercado sent her several messages on Facebook stating that McCullers's children would wake up to Jesus, and that she should kiss her children goodbye every time she went to the AM/PM convenience store because she would not return. As the

---

[16] In footnote 15 of her opening brief, Mercado makes a passing comment about how the trial court erroneously denied a defense motion in limine to preclude the prosecution from proceeding under a theory of implied malice second degree murder. We need not reach the issue of whether the trial court's ruling was in fact erroneous as the juries convicted both defendants of first degree murder.

dispute continued to escalate between Cummings and McCullers, Mercado sent additional threats to McCullers such as: " 'I'm with that killing shit bitch.  Fuck a fight.' "  She asked McCullers how she would feel if Hicks "was found dead at AM/PM," warned McCullers to be careful of her "kids and dogs," and promised McCullers that unless she left Cummings alone, she would "wind up missing."  Immediately after the encounter with McCullers at DD's Discounts and just hours before the shooting, Mercado left McCullers a voicemail warning her that Mercado would come at her unexpectedly, and that it was now Mercado's turn.  Mercado's statements were explicit and direct threats to the lives of McCullers, Hicks, and their children from which the jury could reasonably conclude that Mercado harbored an intent to kill.

Second, Mercado made statements that demonstrated her knowledge that Pitts had an intent to kill.  Just hours after the encounter at DD's Discounts, Mercado spoke with Hodges (the girlfriend of Mercado's brother) and revealed her plan that she *and* Pitts were "going to go shoot up that house" in retaliation for the confrontation initiated by McCullers.  Hours after this conversation, Pitts in fact did precisely what Mercado said he would do—shoot up the Monaco house.  The jury could reasonably infer from this evidence that Mercado knew of (and shared) Pitts's intent to kill.

Third, there was overwhelming evidence from which the jury could reasonably conclude there was an agreement between Mercado and Cummings to commit murder in the first degree.  The jury heard evidence that defendants both made threats that they would have Pitts shoot up the Monaco house, that defendants jointly went with Pitts to purchase ammunition at Turner's and led him directly to the Monaco house afterward,

26

that defendants waited for Pitts to finish shooting before driving him away from the scene, and that defendants assisted Pitts in seeking refuge at his mother's home. This evidence, coupled with evidence that the defendants shared a close friendship, was more than enough to support the jury's finding of an agreement to kill.

Fourth, Mercado's statements and conduct demonstrated deliberation and premeditation. As to planning activity, the jury heard evidence that Mercado planned to shoot up the Monaco house with Pitts, that Mercado went with Pitts and Cummings to purchase ammunition for a firearm already in Pitts's possession, that Mercado preferred to "pop a cap" rather than use a taser, and that Mercado drove Pitts and Cummings to the Monaco house directly from Turner's under the cover of darkness. With regards to motive, the jury heard evidence that Mercado was fed up with the harassment and poor treatment that she believed her best friend was receiving at the hands of McCullers and Hicks. And with respect to the manner of killing, the jury heard evidence that Makiya stood up as the second shot was fired into the house, that Makiya was approximately the same height as McCullers, and that a person standing outside could easily discern shapes and figures through the sheer curtains. The jury could reasonably infer from this evidence that Pitts shot at Makiya believing she was McCullers, thus reflecting a preconceived design of killing the person who Mercado saw as the source of Cummings's harassment.

Mercado argues that she was a mere bystander to the dispute between Cummings and McCullers, that her threatening messages amounted to nothing more than puffery and bravado, that she merely accompanied Cummings and Pitts to Turner's and bought nothing herself, and that she had no idea that Pitts

27

would fire at the Monaco house. Mercado also points to Cummings's testimony at trial that Mercado knew of Pitts's violent tendencies, and thus acted under duress on the night of August 9. Mercado, like Cummings, is asking this court to reweigh the evidence and to second guess the jury's credibility determinations. For the reasons discussed above, we decline to do so. (See *In re E.H.*, *supra*, 108 Cal.App.4th at p. 669.)

In sum, the record before us contains more than substantial evidence to support the juries' verdicts as to count 1 for both defendants.

## II. Remand for resentencing on count 2 is necessary because of trial court error and newly enacted legislation

### A. The trial court erroneously applied the merger doctrine to count 2

Defendants contend, and the Attorney General agrees, that the trial court erroneously applied the merger doctrine when sentencing on count 2. We agree as well.

As the Supreme Court explained in *People v. Chun* (2009) 45 Cal.4th 1172, 1188, the merger doctrine developed as a limit on the *second degree* felony-murder rule to "ameliorate [the rule's] perceived harshness." Under the merger doctrine, "the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies 'merge' with the homicide and cannot be used for purposes of felony murder." (*Id.* at p. 1189.) "When the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, . . . the felony merges with the homicide and cannot be the basis of a [second degree] felony-murder instruction." (*Id.* at p. 1200.)

As the parties correctly point out, the merger doctrine has no application in this case because the trial court never instructed the juries on the felony-murder rule as a theory of liability for either first or second degree murder. Rather, the jury was exclusively presented with aiding and abetting (first and second degree murder) and conspiracy (first degree murder) as theories of liability. Thus, the trial court erred by applying the merger doctrine to count 2.

While the parties agree that the trial court erroneously applied the merger doctrine, they disagree about how this court should proceed with remand in light of this error. Defendants argue that we should construe the trial court's sentence on count 2 as proceeding under section 654, and thus we should remand with instructions to the trial court to resentence based on Assembly Bill No. 518 (2021–2022 Reg. Sess.), which recently amended section 654 to allow for judicial discretion in selecting the longer or shorter term when a defendant is convicted for the same act under different provisions of the law.[17] The Attorney

---

[17] At the time of defendants' sentencing in March 2021, section 654, subdivision (a) required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the longest possible term. (Stats. 1997, ch. 410, § 1). "Effective January 1, 2022, Assembly Bill No. 518 amended section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to 'be punished under either of such provisions.' [Citation.] Thus, under newly amended section 654, a trial court is no longer required to punish under the longest possible term of imprisonment when multiple offenses are based on the same act

29

General argues that the record does not support such a construction of the trial court's ruling, and in any event, section 654 does not apply to the facts of this case.

We reject defendants' request to construe the trial court's sentence on count 2 as having been imposed and stayed pursuant to section 654. It is abundantly clear from the record that the trial court stayed and imposed the seven-year sentence based on the merger doctrine, and *not* pursuant to section 654. The trial court stated multiple times that it was proceeding under the merger doctrine, and explicitly recognized "that this is different than [section] 654." Because there is no basis in the record from which to construe the trial court's sentence as having proceeded under section 654, we decline defendants' request to remand with instructions to resentence in light of Assembly Bill No. 518. To the extent the Attorney General is asking this court to remand with instructions for the trial court not to apply section 654, we decline that request as well. It is up to the trial court at resentencing to decide in the first instance whether section 654 applies (or does not apply) to the circumstances of this case. We express no opinion on that matter.

## B. Remand is required for the trial court to consider Senate Bill No. 567 and Assembly Bill No. 124

Defendants contend, and the Attorney General agrees, that the matter must be remanded for resentencing as to count 2 for

---

or omission. [Citation.] Section 654 'now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence.' " (*People v. White* (2022) 86 Cal.App.5th 1229, 1236.)

the trial court to consider Senate Bill No. 567 and Assembly Bill No. 124, both of which apply retroactively under *In re Estrada* (1965) 63 Cal.2d 740. As explained below, we agree as well.

Effective January 1, 2022, Senate Bill No. 567 and Assembly Bill No. 124 amended section 1170, the determinate sentencing law, "in several fundamental ways." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038.) Both Senate Bill No. 567 and Assembly Bill No. 124 apply retroactively to defendants whose convictions were not yet final when the laws became effective. (*Flores*, at p. 1039 [Senate Bill No. 567]; *People v. Banner* (2022) 77 Cal.App.5th 226, 240 [Assembly Bill No. 124].)

Senate Bill No. 567 "amended section 1170, former subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist." (*People v. Flores*, *supra*, 73 Cal.App.5th at p. 1038.) "Under this change in law, a trial court 'may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' " (*Id*. at p. 1038, fn. 10.)

Assembly Bill No. 124 amended section 1170 such that the trial court is now required to impose the lower term (unless contrary to the interests of justice with aggravating circumstances outweighing mitigating circumstances) if the defendant's own "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or

31

sexual violence" was a "contributing factor in the commission of the offense." (§ 1170, subd. (b)(6)(A).)

Here, the trial court listed a number of different factors in support of its decision to impose the upper term of seven years on count 2 as to both defendants including the vulnerability of the victim, the degree of cruelty, viciousness, and callousness present, and the level of planning and sophistication. Defendants, however, did not stipulate to these factors and the trial court did not specify that it was finding these aggravating factors true beyond a reasonable doubt, as now required by Senate Bill No. 567. Additionally, the trial court did not articulate on the record whether there was evidence (or not) that psychological, physical, or childhood trauma contributed to the commission of the underlying offense, which would militate in favor of imposing the lower term under Assembly Bill No. 124.

Accordingly, remand is necessary for the trial court to resentence on count 2 and apply Senate Bill No. 567 and Assembly Bill No. 124.

## DISPOSITION

Defendants' sentences on count 2 are vacated, and the matter is remanded for resentencing as to count 2 only. The judgments of conviction for both defendants are otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

NGUYEN (KIM), J.*

We concur:

EDMON, P. J.

EGERTON, J.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.